513 P.3d 352
IN RE: COLORADO INDEPENDENT LEGISLATIVE REDISTRICTING COMMISSION, Petitioner.
Supreme Court Case No. 21SA305 Supreme Court of Colorado.
November 15, 2021
Attorneys for Petitioner: Law Office of Richard C. Kaufman PC, Inc., Richard C. Kaufman, Centennial, Colorado, Peters Schulte Odil & Wallshein LLC, Timothy R. Odil, Loveland, Colorado, Colorado Independent Redistricting Commissions Staff, Jeremiah B. Barry, H. Pierce Lively, Jacob J. Baus, Denver, Colorado
Attorneys for Proponents Colorado Republican Committee, Colorado Republican State Senate Caucus, and Colorado Republican State House Caucus: Brownstein Hyatt Farber Schreck, LLP, Christopher O. Murray, Julian R. Ellis, Jr., Denver, Colorado
Attorneys for Proponent Douglas County Board of County Commissioners: Robert McGuire Law Firm, Robert A. McGuire, III, Denver, Colorado
Attorneys for Proponents League of United Latin American Citizens and Colorado League of United Latin American Citizens: Eric Maxfield Law, LLC, Eric Maxfield, Boulder, Colorado, Campaign Legal Center, Mark P. Gaber, Washington, District of Columbia
Attorneys for Opposer Colorado Latino Leadership, Advocacy & Research Organization: Ballard Spahr LLP, Chad Jimenez, Patrick G. Compton, Alexia Chapman, Denver, Colorado
Attorneys for Opposer Fair Lines Colorado: Recht Kornfeld, P.C., Mark G. Grueskin, Denver, Colorado
Attorneys for Opposer Lynn Gerber: Faegre Drinker Biddle & Reath LLP, James Spaanstra, Douglas Benevento, Denver, Colorado
Attorneys for Opposer Doris Morgan: Maven Law Group, Suzanne Taheri, Denver, Colorado
Attorneys for Opposer Thomas E. Norton: Robert McGuire Law Firm, Robert A. McGuire, III, Denver, Colorado
En Banc
JUSTICE GABRIEL delivered the Opinion of the Court. ¶1 This is an original proceeding filed pursuant to article V, section 48.3 of the Colorado Constitution. In this proceeding, which is a companion case to In re Colorado Independent Congressional Redistricting Commission , 2021 CO 73, 497 P.3d 493, we review the final legislative redistricting plans for the Colorado Senate and the Colorado House of Representatives (the "Senate Plan" and the "House Plan," and, collectively, the "Plans") adopted and submitted to us by the Colorado Independent Legislative Redistricting Commission (the "Commission"). Under our constitution, our review is a limited one. It is not our task to determine whether other plans could have been adopted. Nor is it our role to decide whether we might have adopted different plans were we acting in the first instance. Rather, under article V, section 48.3, we must review the Plans to determine whether they comply with the criteria listed in section 48.1 of article V, and we must approve those Plans unless we conclude that the Commission abused its discretion in applying or failing to apply those criteria in light of the record before it.
¶2 We now conclude that the Commission did not abuse its discretion here, and we thus approve the Plans and order the Commission to file those Plans with the Colorado Secretary of State no later than December 29, 2021, as required by article V, section 48.3(5).
I. Facts and Procedural History
¶3 In 2018, Colorado voters adopted Amendment Z, which replaced the former Colorado Reapportionment Commission with the present Commission. The goal of Amendment Z, which is now found in article V, sections 46 through 48.4 of the Colorado Constitution, was to eliminate partisan politics from the redistricting process and to ensure both that the Commission's deliberations are transparent and open to the public and that the public has substantial opportunities to participate in the process. See, e.g. , Colo. Const. art. V, § 47 (describing the composition of the Commission and the criteria and selection process for commissioners); id. §§ 48(3), 48.2 (providing for public involvement in the redistricting process, including detailed requirements for public hearings, the requirement of a website or comparable means of communicating with the public, and a requirement that all written comments pertaining to redistricting be published, and setting forth deadlines for public comment and public hearings).
¶4 Amendment Z also sets forth detailed criteria for the preparation, amendment, and approval of redistricting plans, including deadlines for the preparation and adoption of preliminary and final plans. See id. § 48.2. The Commission's work in this regard was substantially hindered, however, by the effects of the COVID-19 pandemic, and particularly the fact that final census data, which was due to be released on April 1, 2021, was not actually received until August 12, 2021. As a result, pursuant to article V, section 48.2(5)(c), the Commission adjusted several of the deadlines and asked this court to establish a revised schedule for the approval of the final Plans. We thereafter exercised our authority under article V, section 48.3 and adopted a schedule requiring simultaneous briefing from all interested parties seven days after the Commission submitted the Plans to us, but no later than October 22, 2021, with oral argument to be conducted on October 25, 2021 and this court to issue its opinion by the constitutionally mandated November 15, 2021 deadline. See In re Colo. Indep. Cong. Redistricting Comm'n , ¶¶ 31–36 (addressing the propriety of extending the Independent Congressional Redistricting Commission's deadline to submit its final plan to this court, which analysis applies to the Commission's deadline here, as well).
¶5 Notwithstanding the difficult circumstances, the Commission, its nonpartisan staff, its outside counsel, and numerous members of the public, interested parties, and their counsel worked tirelessly to ensure that the process worked as the people of Colorado intended, and the court expresses its gratitude to all those who participated in this process for their exceptional efforts in these most extraordinary of times.
¶6 The Governor convened the Commission on March 30, 2021, and it commenced its work. Thereafter, the Commission held 45 meetings and 35 public hearings across the state (exceeding the number of hearings required by Amendment Z), and it established a website for public comments where over 5,000 comments were made. The Commission's work culminated in its adoption of the House Plan, by a vote of 11 to 1, on October 11, 2021, and the Senate Plan, by a vote of 12 to 0, on October 12, 2021. Thereafter, on October 15, 2021, the Commission timely submitted its final Plans to us, and on October 21, 2021, the Commission filed an errata regarding certain exhibits (the Plans and maps, as corrected, are reproduced in the attached appendix). On October 22, 2021, the Commission and eight interested parties timely filed briefs in support of or opposition to the Plans (two of the interested "parties" were comprised of multiple aligned organizations). And we conducted an oral argument on October 25, 2021, at which the Commission and four of the interested parties presented argument.
¶7 Of the parties submitting briefs to us, the Colorado Republican Committee, Colorado Republican State Senate Caucus, and Colorado Republican State House Caucus; the Douglas County Board of County Commissioners; and the League of United Latin American Citizens and the Colorado League of United Latin American Citizens (collectively, "Proponents") urged approval of the Plans. The Colorado Latino Leadership, Advocacy & Research Organization ("CLLARO"); Fair Lines Colorado; Ms. Lynn Gerber; Ms. Doris Morgan; and former Greeley Mayor, State Senator, and Executive Director of the Colorado Department of Transportation Thomas E. Norton (collectively, "Opposers") filed briefs urging disapproval, in whole or in part, of the Plans.
¶8 With respect to the Opposers, CLLARO opposes the splitting of the City of Lakewood into Senate Districts 20 and 22 because, among other things, the Commission did not make findings to support such a split, and to the extent the record speaks to the issue, it discussed only an east-west split and not the final north-south split. Fair Lines Colorado opposes the splitting of the City of Lakewood on similar grounds and further opposes the splitting of Jefferson County into a fifth Senate district, Senate District 4, viewing that additional split to be unwarranted and unsupported by the record before the Commission. Ms. Gerber opposes both the Senate Plan and the House Plan because she believes that neither complies with article V, section 48.1(3), which requires that the plans adopted by the Commission maximize the number of politically competitive districts to the extent possible. Ms. Morgan opposes the split of Pueblo West because she asserts that the Commission erred in not recognizing that so-called "census-designated place" as a community of interest in itself. And Senator Norton opposes the split of the City of Greeley, contending that the split (1) was contrary to the criteria set forth in article V, section 48.1(2) ; (2) was done for predominantly race-based reasons and therefore violated the Equal Protection Clause of the United States Constitution; and (3) violated article V, section 48.1(4)(b) because it improperly diluted the impact of non-minority voters’ electoral influence.
II. Analysis
¶9 We begin by setting forth the applicable standard of review. We then note the criteria listed in article V, section 48.1, which form the basis for our review. Finally, we review the Plans’ compliance with each of those criteria, addressing Opposers’ points of dispute in the course of this discussion.
A. Standard of Review
¶10 Article V, section 48.3 guides our review of the Plans now before us. That section provides, in pertinent part:
(1) The supreme court shall review the submitted plans and determine whether the plans comply with the criteria listed in section 48.1 of this article V....
(2) The supreme court shall approve the plans submitted unless it finds that the commission ... abused its discretion in applying or failing to apply the criteria listed in section 48.1 of this article V, in light of the record before the commission. The supreme court may consider any maps submitted to the commission in assessing whether the commission ... abused its discretion.
Id. ¶11 The Commission abuses its discretion if it "applies an erroneous legal standard" or if "no competent evidence in the record supports its ultimate decision." Langer v. Bd. of Comm'rs , 2020 CO 31, ¶ 13, 462 P.3d 59, 62. We will conclude that no competent evidence supported the Commission's decision only if that decision was "so devoid of evidentiary support that it can only be explained as an arbitrary and capricious exercise of authority." Id. (quoting Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't , 196 P.3d 892, 900 (Colo. 2008) ). The ultimate question before us is not whether the Commission adopted the "best" of the options presented to it or whether we might have adopted different plans were we acting in the first instance, but rather whether the final adopted Plans "fell within the range of reasonable options" available to the Commission in light of the record before it. Hall v. Moreno , 2012 CO 14, ¶¶ 54, 56, 270 P.3d 961, 973–74 (quoting E-470 Pub. Highway Auth. v. Revenig , 140 P.3d 227, 231 (Colo. App. 2006) ). "The choice among alternative plans, each consistent with constitutional requirements, is for the Commission and not the Court." In re Reapportionment of Colo. Gen. Assembly , 647 P.2d 191, 194 (Colo. 1982).
B. Article V, Section 48.1
¶12 As noted above, article V, section 48.1 sets forth the criteria that the Commission was to follow in adopting the Plans now before us. That section provides:
(1) In adopting a legislative redistricting plan, the commission shall:
(a) Make a good-faith effort to achieve mathematical population equality between districts, as required by the constitution of the United States, but in no event shall there be more than five percent deviation between the most populous and the least populous district in each house. Districts must be composed of contiguous geographic areas.
(b) Comply with the federal "Voting Rights Act of 1965", 52 U.S.C. sec. 50301, as amended [sic; the applicable provision of the Voting Rights Act of 1965 is codified at 52 U.S.C. § 10301 ].
(2)(a) As much as is reasonably possible, the commission's plan must preserve whole communities of interest and whole political subdivisions, such as counties, cities, and towns. To facilitate the efficient and effective provision of governmental services, with regard to any county, city, city and county, or town whose population is less than a district's permitted population, the commission shall presume that such county, city, city and county, or town should be wholly contained within a district; except that a division of such county, city, city and county, or town is permitted where, based on a preponderance of the evidence in the record, a community of interest's legislative issues are more essential to the fair and effective representation of residents of the district. When the commission divides a county, city, city and county, or town, it shall minimize the number of divisions of that county, city, city and county, or town.
(b) Districts must be as compact as is reasonably possible.
(3)(a) Thereafter, the commission shall, to the extent possible, maximize the number of politically competitive districts.
(b) In its hearings in various locations in the state, the commission shall solicit evidence relevant to competitiveness of elections in Colorado and shall assess such evidence in evaluating proposed maps.
(c) When the commission approves a plan, ... the nonpartisan staff shall, within seventy-two hours of such action, make publicly available, and include in the commission's record, a report to demonstrate how the plan reflects the evidence presented to, and the findings concerning, the extent to which competitiveness in district elections is fostered consistent with the other criteria set forth in this section.
(d) For purposes of this subsection (3), "competitive" means having a reasonable potential for the party affiliation of the district's representative to change at least once between federal decennial censuses. Competitiveness may be measured by factors such as a proposed district's past election results, a proposed district's political party registration data, and evidence-based analyses of proposed districts.
(4) No map may be approved by the commission or given effect by the supreme court if:
(a) It has been drawn for the purpose of protecting one or more incumbent members, or one or more declared candidates, of the senate or house of representatives, or any political party; or
(b) It has been drawn for the purpose of or results in the denial or abridgement of the right of any citizen to vote on account of that person's race or membership in a language minority group, including diluting the impact of that racial or language minority group's electoral influence.
Id.
¶13 We proceed to address whether the Commission satisfied its constitutional obligation to ensure that its Plans comply with each of these criteria.
C. Compliance with Constitutional Criteria
1. Mathematical Population Equality
¶14 As noted above, article V, section 48.1(1)(a) requires the Commission to "[m]ake a good-faith effort to achieve mathematical population equality between districts." This requirement, derived from the Constitutional requirement of one-person, one-vote, allows for a slight deviation in population equality between state legislative districts, as long as that deviation is no more than a "five percent deviation between the most populous and the least populous district in each house." Id. ; see also Evenwel v. Abbott , 578 U.S. 54, 136 S. Ct. 1120, 1124, 194 L.Ed.2d 291 (2016) (noting that under the one-person, one-vote requirement, "when drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives, among them, preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness," but maximum population deviations between the largest and smallest districts above ten percent are presumptively impermissible).
¶15 No party has disputed that the Plans achieve acceptable population equality, and the record supports such a conclusion. Specifically, the most populous House district has a population of 90,864, while the least populous House district has a population of 86,485, with an overall deviation range of 4.93 percent. And the most populous Senate district has a population of 169,103, while the least populous Senate district has a population of 160,874, with an overall deviation range of 4.99 percent. The Commission has also advised that, unlike the Independent Congressional Redistricting Commission, it chose to adjust census blocks to reallocate state prisoners to their pre-incarceration residence, and in the case of both the House and Senate districts, the most populous district is less than 5 percent larger than the smallest. No party before us has challenged the Commission's approach in this regard.
¶16 For these reasons, we conclude that the Plans have achieved sufficient mathematical population equality under article V, section 48.1(1)(a).
2. Contiguous Geographic Areas
¶17 Article V, section 48.1(1)(a) further requires that districts be composed of "contiguous geographic areas." A review of the maps adopted as part of the Plans shows that the Commission has complied with this requirement, and, again, no party disputes this.
3. Section 2 of the Voting Rights Act of 1965
¶18 Article V, section 48.1(1)(b) requires that the Plans comply with section 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301. No party disputes that the Plans comply with this requirement, and we agree.
¶19 Section 2(a) of the VRA provides:
No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color .... 52 U.S.C. § 10301(a).
¶20 A state violates section 2(a)
if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [racial group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided , That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
Id. § 10301(b). ¶21 Section 2 focuses solely on the consequences of apportionment. Voinovich v. Quilter , 507 U.S. 146, 155, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993). "Only if the apportionment scheme has the effect of denying a protected class the equal opportunity to elect its candidate of choice does it violate § 2 ...." Id. The Supreme Court has further construed section 2's prohibitions as extending to " ‘vote dilution’—brought about ... by the ‘dispersal of [a group's members] into districts in which they constitute an ineffective minority of voters.’ " Cooper v. Harris , ––– U.S. ––––, 137 S. Ct. 1455, 1464, 197 L.Ed.2d 837 (2017) (quoting Thornburg v. Gingles , 478 U.S. 30, 46 n.11, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) ).
¶22 In Gingles , 478 U.S. at 50–51, 106 S.Ct. 2752, the Supreme Court identified three necessary preconditions for proving vote dilution in violation of section 2: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority" in a district; (2) the minority group must be "politically cohesive"; and (3) the district's white majority must "vote[ ] sufficiently as a bloc" to enable it, absent special circumstances, usually to defeat the minority's preferred candidate. See also Bartlett v. Strickland , 556 U.S. 1, 21, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009) (plurality opinion) (describing the Gingles requirements as "preconditions, consistent with the text and purpose of § 2, to help courts determine which claims could meet the totality-of-the-circumstances standard for a § 2 violation"). ¶23 As we observed in In re Colorado Independent Congressional Redistricting Commission , ¶ 48, when these showings are made, states may, consistent with the VRA, provide certain protections for minority voters, including the creation of majority-minority districts, to ensure fair access to the electoral process. Section 2 of the VRA, however, does not require a state to draw "influence" districts (i.e., districts that allow minority voters who cannot form a reasonably compact majority-minority district to be able to influence the outcome between particular candidates). Id. at ¶ 49 ; see also League of United Latin Am. Citizens v. Perry , 548 U.S. 399, 446, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006) (plurality opinion) ("The failure to create an influence district in these cases thus does not run afoul of § 2 of the Voting Rights Act."). Nor does section 2 of the VRA require a state to draw so-called "crossover" districts (i.e., districts in which the minority population is at least potentially large enough to elect the candidate of its choice with the support of majority-population voters who cross over to support the minority's preferred candidate). In re Colo. Indep. Redistricting Comm'n , ¶ 50 ; accord Bartlett , 556 U.S. at 22, 129 S.Ct. 1231. The Supreme Court has made clear, however, that states may draw such crossover districts when no other prohibition exists. Bartlett , 556 U.S. at 24, 129 S.Ct. 1231. ¶24 Here, the Commission adopted a policy to guide its VRA investigation and deliberations, and it also retained a VRA expert, Dr. Lisa Handley, to ensure its compliance with the VRA. These actions made sense in the context of the redistricting at issue here because legislative districting has long implicated VRA compliance issues, given that the size of Colorado legislative districts enables the drawing of compact majority-minority districts. Notably, however, the Commission did not ask Dr. Handley to draw minority influence districts throughout Colorado. Rather, consistent with the first Gingles requirement, the Commission began by determining whether there were minority groups that were sufficiently large and compact to constitute a majority of a district's voting-age population. The Commission then designated a number of areas for analysis by Dr. Handley, and she studied these areas to (1) identify minority-preferred candidates, (2) determine whether bloc voting occurred in elections involving those candidates, and (3) estimate the percentage of the Hispanic or minority voting-age population that would be necessary in a given district to elect Hispanic or minority-preferred candidates. (For consistency, we use the term "Hispanic," as opposed to the terms "Latino" or "Latinx" preferred by some members of this community, because the Commission has used that term.) Because Colorado has not had a statewide minority candidate in a recent election, Dr. Handley analyzed House and Senate races from 2018 and 2020. She ultimately concluded that, with limited exceptions, those races revealed polarized voting patterns that satisfied the second Gingles requirement. She further concluded, however, that, despite such polarized voting, minority voters in many of these districts have been able to elect their candidates of choice because the districts were crossover districts.
¶25 In conjunction with Dr. Handley's efforts, nonpartisan Commission staff used two methods (geographic overlap between the existing and proposed districts and voter overlap between the existing and proposed districts) to apply Dr. Handley's conclusions to the districts adopted in the Plans. These efforts confirmed that Colorado currently has seven majority-minority voting-age population House districts and four majority-minority voting-age population Senate districts, and the Plans retain the same numbers of majority-minority districts, respectively.
¶26 The foregoing confirms that the Plans comply with section 2 of the VRA, and we so conclude.
4. Preservation of Communities of Interest and Political Subdivisions
¶27 Article V, section 48.1 (2)(a) requires that, "[a]s much as is reasonably possible, the commission's plan must preserve whole communities of interest and whole political subdivisions, such as counties, cities, and towns." This section further provides that "with regard to any county, city, city and county, or town whose population is less than a district's permitted population, the commission shall presume that such county, city, city and county, or town should be wholly contained within a district." Id. But this section expressly allows for the division of any such political subdivision when, "based on a preponderance of the evidence in the record, a community of interest's legislative issues are more essential to the fair and effective representation of residents of the district." Id. When the commission divides a county, city, city and county, or town, however, it is required to minimize the number of such divisions. Id.
¶28 As noted above, several Opposers assert that the Commission violated this constitutional requirement. We address their assertions in turn.
a. City of Lakewood ¶29 CLLARO and Fair Lines Colorado oppose the splitting of the City of Lakewood into Senate Districts 20 and 22.
¶30 CLLARO contends that the Senate Plan never states that the City of Lakewood was divided to preserve a community of interest and, to the extent that the record addresses splitting this city, it discussed only an east-west split and not the final north-south split. CLLARO further argues that the Senate Plan erroneously stated that the basis for dividing political subdivisions was to maintain equal populations between the districts. And CLLARO asserts that the Commission erroneously assumed that the Senate Plan need only preserve cities like Lakewood "as much as reasonably possible," whereas section 48.1(2)(a) presumes that cities like Lakewood should be wholly contained within a district.
¶31 Fair Lines Colorado similarly argues that (1) the constitution establishes a presumption that cities like Lakewood must be maintained whole; (2) the City of Lakewood has specific policy needs that warrant its unification in one district; and (3) no countervailing circumstances required, nor did the record otherwise support, the splitting of the city into two Senate districts.
¶32 Of the issues presented to us, this issue is the closest and most difficult because, as CLLARO and Fair Lines Colorado observe, the record evidence supporting the Commission's decision in this regard is thin. Nonetheless, on the record before us, and mindful of our limited role in reviewing the Plans presented for our consideration, we cannot conclude that the splitting of the City of Lakewood resulted from the application of an erroneous legal standard or was unsupported by competent evidence in the record. See Langer , ¶ 13, 462 P.3d at 62.
¶33 The record here reveals that the Commission received comments from at least some parties, including Lakewood's mayor and CLLARO itself, requesting that the Commission not divide Lakewood. And in a memorandum that it submitted, CLLARO observed that Lakewood's mayor wanted the city to remain "as whole as possible," but, if a split were necessary, the mayor preferred an east-west split.
¶34 Conversely, the Commission received many comments identifying a community of interest between Wheat Ridge and Lakewood, as well as along the Sheridan corridor in Lakewood. These commentators noted that the foregoing communities of interest shared, among other concerns, significant transportation problems, compounded by ongoing growth and development, that legislatively aligned residents in these areas. See Colo. Const. art. V, § 46 (3)(b) (defining "[c]ommunity of interest" to mean "any group in Colorado that shares one or more substantial interests that may be the subject of state legislative action, is composed of a reasonably proximate population, and thus should be considered for inclusion within a single district for purposes of ensuring its fair and effective representation"). And although, at oral argument, Fair Lines Colorado took issue with the Commission's characterization of the "Sheridan corridor" as a community of interest, we understand the Commission to be referring to the people who live and work along that corridor (and we note that, in its above-mentioned memorandum, CLLARO itself addressed the "Sheridan corridor" in the context of discussing communities of interest).
¶35 We acknowledge that the record regarding the Commission's decision to split the City of Lakewood between Senate Districts 20 and 22 is not ideal, and the Commission could have made a better and more explicit record to support its decision. But we perceive no requirement that the Commission make express findings to support its ultimate determinations, as Fair Lines Colorado suggests. Rather, as noted above, we must determine whether the Commission applied an erroneous legal standard and whether any competent evidence in the record supports its ultimate decision. Langer , ¶ 13, 462 P.3d at 62. Applying that deferential standard here, we cannot conclude, on the record before us, that the evidence failed to support the Commission's implicit determination, based on a preponderance of the evidence, that the identified communities of interests’ legislative issues were more essential to the fair and effective representation of the district's residents than keeping the City of Lakewood undivided.
¶36 In reaching this conclusion, we acknowledge, as we must, that many of the comments addressing the split of the City of Lakewood were made in the context of discussing either House districts or Congressional districts. Nonetheless, we cannot ignore that these comments are in the record before the Commission and that they tend to support a decision to split the City of Lakewood as the Commission did. We perceive no reason to conclude that the Commission was precluded from considering these comments merely because they may have been offered in other contexts.
¶37 Moreover, we deem it relevant that CLLARO expressly raised many of the issues that it raises before us (and, in fact, submitted its own plan) before the Commission, but the Commission did not accept CLLARO's arguments or its plan. This tends to support a conclusion that the Commission, in fact, considered, but chose to reject, alternatives that would have kept Lakewood together in one Senate district.
¶38 Finally, although perhaps not directly relevant to the Commission's determination of communities of interest, we note that the Commission considered some thirty different plans and amendments to plans, many of which split the City of Lakewood into two (or even three) districts. The record reveals very little commentary on these proposed plans and no comments between October 5, 2021 and the adoption of the final Senate Plan either supporting or opposing a split of the City of Lakewood into two Senate districts. These circumstances weigh against a conclusion that the Commission acted arbitrarily or capriciously in proceeding with a Plan that splits the City of Lakewood.
¶39 Accordingly, although we view the issue as close, we ultimately perceive no abuse of discretion in the Commission's decision to split the City of Lakewood between Senate Districts 20 and 22.
b. Senate District 4 ¶40 Fair Lines Colorado further opposes the splitting of Jefferson County into a fifth Senate district, Senate District 4. As Fair Lines Colorado observes, five populated segments of Jefferson County were placed in different Senate districts, namely, Senate Districts 4, 16, 19, 20, and 22. Fair Lines Colorado states that, based on the ideal population of a Senate district, Jefferson County could have been divided into four districts, but the Commission adopted a five-way split, with just under 30,000 residents of that county grouped into Senate District 4 with residents of Custer, Fremont, Lake, Chaffee, Park, Teller, and Douglas Counties. Fair Lines Colorado contends that no coherent community of interest exists among these counties and thus linking them is not more essential to the fair and effective representation of district residents than keeping the approximately 30,000 Jefferson County residents assigned to Senate District 4 together with Jefferson County residents in one of the other four districts. Fair Lines Colorado thus requests that we disapprove the Senate Plan and return that Plan to the Commission with instructions that the Commission either provide an adequate explanation for the additional split or reassign the approximately 30,000 Jefferson County residents placed in Senate District 4 to one of the other districts of Jefferson County residents. For several reasons, we are unpersuaded.
¶41 First, it is unclear to us that article V, section 48.1(2)(a) even applies in this circumstance, when the population of the county indisputably requires that the county be split and the issue is the number of divisions. Section 48.1 (2)(a) concerns the scenario in which a political subdivision's population is less than a district's permitted population. Those are not the facts here. ¶42 Second, even if section 48.1(2)(a) does apply, as noted above, we perceive no requirement that the Commission make express findings to justify its decision to divide a political subdivision like Jefferson County, as long as competent evidence in the record supports that decision. See Langer , ¶ 13, 462 P.3d at 62.
¶43 Third, and in any event, the record sufficiently supports the Commission's decision to divide Jefferson County as it did. Specifically, the Commission has stated that it needed to place additional people in Senate District 4 to meet the constitutional population requirement, and going anywhere but Jefferson County would have required the Commission to divide counties that have a smaller population than a Senate district, which section 48.1(2)(a) presumptively precludes. Additionally, the Commission has explained that attempting to draw population from elsewhere would likely have resulted in dividing some communities of interest that the Commission was seeking to preserve in one Senate district. And the Commission has indicated that its decision to place the southern portions of Jefferson County into Senate District 4 was further supported by public comments suggesting that this area had a community of interest along U.S. Highway 285 and had legislative interests different from the suburban areas of Jefferson County.
¶44 Each of the foregoing reasons given by the Commission for placing the approximately 30,000 Jefferson County residents into Senate District 4 is amply supported by evidence in the record, and we thus perceive no abuse of discretion in the Commission's decision so to split Jefferson County.
c. Pueblo West ¶45 Ms. Morgan opposes the split of Pueblo West into separate House districts. She contends that Pueblo West is a so-called "census-designated place," which she defines as a geographic entity representing closely settled, unincorporated communities that are locally recognized and identified by name. In Ms. Morgan's view, Pueblo West is statistically the equivalent of an incorporated city or town, and therefore the Commission was required to keep it within a single House district. Assuming without deciding that the Commission was required to treat Pueblo West as a political subdivision for purposes of article V, section 48.1(2)(a), we are unpersuaded by Ms. Morgan's argument.
¶46 The Commission concedes that it could have placed Pueblo West in a single House district. The Commission states, however, that it split Pueblo West into two House districts in order to preserve communities of interest. Specifically, the Commission notes that outside of Pueblo County, House District 47 follows county lines and maintains communities of interest in southeastern Colorado. The Commission further observes that, if House District 47 included all of Pueblo West, then, due to House district population limits, the Commission would not have been able to maintain these communities of interest and would either have had to split counties or lose counties that are a part of that community of interest. Alternatively, if House District 47 included none of Pueblo West, then the Commission would have had to include counties in other areas of the state and split those other communities of interest. By splitting Pueblo West instead, the Commission was able to minimize the extent to which House District 60 split Chaffee and Park Counties and their associated communities of interest.
¶47 Because these reasons, too, are sufficiently supported by the record before the Commission, we perceive no abuse of discretion in the Commission's decision to split Pueblo West.
d. City of Greeley ¶48 Senator Norton opposes the split of the City of Greeley into two Senate districts, Senate Districts 1 and 13. He contends, among other things, that the split was contrary to the criteria set forth in article V, section 48.1(2) and was done for predominantly race-based reasons and therefore violated the Equal Protection Clause of the United States Constitution. We disagree.
¶49 Evidence in the record established a substantial divide between East and West Greeley. East Greeley, like the town of Evans to its south, is more industrial than West Greeley. Both East Greeley and Evans have substantial immigrant populations. East Greeley is home to many refugees who work in agricultural processing plants and oil and gas operations. And East Greeley's K–12 school system faces unique challenges to meet educational needs due to the many different languages spoken by its students. In all of these regards, East Greeley shares many legislative concerns with the other residents placed in Senate District 13, and these shared legislative concerns, as well as the fact that Senate District 13 is home to a substantial Hispanic population with a shared community of interest, justified splitting East Greeley from West Greeley and placing it in Senate District 13.
¶50 We likewise are unpersuaded by Senator Norton's argument that the Commission split Greeley for predominantly racial reasons (namely, to increase the Hispanic population in Senate District 13) and that this violated the Equal Protection Clause of the United States Constitution. ¶51 The Equal Protection Clause is implicated when, in the course of redistricting, race-neutral reasons for drawing district lines are subordinated to predominantly racial ones. See Shaw v. Hunt , 517 U.S. 899, 907, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) (noting that strict scrutiny applies when race is the predominant factor in drawing district lines, such that traditional race-neutral districting principles are subordinated to racial considerations); Miller v. Johnson , 515 U.S. 900, 916, 920, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (noting that (1) a plaintiff challenging a redistricting plan on race-based grounds must prove that race was the "predominant factor" motivating the decision to place a significant number of voters inside or outside a particular district; (2) to make this showing, the plaintiff must prove that "the legislature subordinated traditional race-neutral districting principles ... to racial considerations"; and (3) when race was the predominant factor in the districting decision, the plan cannot be upheld unless it satisfies strict scrutiny). But that is not what happened here. The Commission did not split Greeley predominantly to increase the Hispanic population in Senate District 13, as Senator Norton contends. To the contrary, for the reasons discussed above, the Commission split Greeley because the evidence established that legislative issues of various communities of interest were more essential to the fair and effective representation of the district's residents. Such considerations have long been held to be race neutral. See Miller , 515 U.S. at 916, 115 S.Ct. 2475 (describing compactness, contiguity, and respect for political subdivisions or communities of interest as "traditional race-neutral districting principles"); see also id. (noting that (1) "[r]edistricting legislatures will ... almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process"; and (2) when race-neutral considerations formed the basis for the redistricting decision and were not subordinated to race, a state can defeat a claim of racial gerrymandering); Colo. Const. art. V, § 46 (3)(b)(III) (noting that racial, ethnic, and language minority groups may comprise a community of interest).
¶52 For these reasons, we conclude that the Commission's decision to split the City of Greeley did not violate either the requirements of article V, section 48.1(2)(a) or Equal Protection principles.
5. Compactness
¶53 Article V, section 48.1(2)(b) requires that "[d]istricts must be as compact as is reasonably possible." No one has challenged the Commission's Plans on this ground, and we likewise conclude that the Commission has satisfied this criterion. ¶54 Compactness is defined as "a geographic area whose boundaries are as nearly equidistant as possible from the geographic center of the area being considered, allowing for variances caused by population density and distribution, census enumeration districts, and reasonable variations necessitated by natural boundaries and by county lines." Acker v. Love , 178 Colo. 175, 496 P.2d 75, 76 (1972). The goal of this criterion is to "promote ‘fair and effective representation’ by implicitly recognizing that the more densely located a representative's constituents, the easier it is to travel across and to physically engage with the district." Hall , ¶ 51, 270 P.3d at 972. ¶55 Here, the Commission developed and implemented a policy under which it and its staff were to use certain established methods to measure the compactness of the districts in the final Plans, as well as drive times required to traverse large rural districts. The Commission then produced reports establishing that the Commission drew the geographically largest House and Senate districts to ensure that the districts could be traversed with the least amount of drive time possible (here, from four to five-and-one-half hours for these very large districts). We are convinced that in drawing such districts, the Commission has complied with the compactness requirement of section 48.1(2)(b).
6. Competitiveness
¶56 Article V, section 48.1(3)(a) of the Colorado Constitution provides, "Thereafter, the commission shall, to the extent possible, maximize the number of politically competitive districts." The word "[t]hereafter" plainly signals that the Commission is to address this criterion only after it has addressed all of the criteria that precede it in section 48.1 and that we have addressed above. Section 48.1 (3)(b) further requires that in its hearings in various locations around the state, the Commission is to solicit evidence relevant to competitiveness of elections in Colorado and to assess that evidence in evaluating proposed maps. And Section 48.1 (3)(c) requires, among other things, that nonpartisan Commission staff include in the Commission's record a report demonstrating "how the plan reflects the evidence presented to, and the findings concerning, the extent to which competitiveness in district elections is fostered consistent with the other criteria set forth in this section."
¶57 For purposes of section 48.1(3), competitiveness means "having a reasonable potential for the party affiliation of the district's representative to change at least once between federal decennial censuses." Colo. Const. art. V, § 48.1 (3)(d). "Competitiveness may be measured by factors such as a proposed district's past election results, a proposed district's political party registration data, and evidence-based analyses of proposed districts." Id. ¶58 Here, the record reflects that the Commission complied with the above-noted mandates to solicit evidence and prepare and place in the record a report regarding how the Plans comply with section 48.1(3)’s competitiveness requirement, and no party disputes that the Commission complied with these requirements.
¶59 In addition, the record shows that the Commission requested and received a so-called "ensemble analysis" prepared by Dr. Jeanne Clelland of the University of Colorado, Drs. Beth Malmskog and Flavia Sancier-Barbosa of Colorado College, and Dr. Daryl DeFord of Washington State University. In an ensemble analysis, a particular district plan is compared to a large collection of randomly generated, legally valid plans, referred to as an "ensemble" of plans. Here, this analysis entailed having the outside experts generate over two million possible redistricting plans and prepare a statistical analysis of those plans. The Commission then compared the competitiveness results of the actual plans that it had considered to the ensemble of more than two million plans to confirm that the Plans at issue maximized competitiveness, and the Commission determined that the districts drawn in its Plans fell within the expected statistical ranges for competitiveness. ¶60 Notwithstanding the foregoing, Ms. Gerber contends that the Commission abused its discretion in adopting the Plans at issue because the Plans did not maximize the districts’ competitiveness. In support of this argument, Ms. Gerber points out that other plans before the Commission had more competitive districts than the Plans that the Commission ultimately adopted.
¶61 Although it may well be true that other plans submitted to the Commission contained more competitive districts than the Plans now before us, the Commission was not required to adopt the plans with the most competitive districts. Rather, as mentioned, after considering all of the above criteria, the Commission was required to maximize the number of politically competitive districts "to the extent possible." In light of the foregoing, we are convinced that the Commission complied with its obligation to apply all of the criteria discussed above and then to maximize the number of politically competitive districts to the extent possible.
7. Remaining Criteria
¶62 Finally, article V, section 48.1(4) provides that no map may be approved by the Commission or be given effect by this court if:
(a) It has been drawn for the purpose of protecting one or more incumbent members, or one or more declared candidates, of the senate or house of representatives, or any political party; or
(b) It has been drawn for the purpose of or results in the denial or abridgement of the right of any citizen to vote on account of that person's race or membership in a language minority group, including diluting the impact of that racial or language minority group's electoral influence.
¶63 As to the first of these criteria, the Commission and its non-partisan staff have affirmed on the record that the Plans were not drawn for the purpose of protecting any incumbent members of the Colorado Senate or House of Representatives, any declared candidates, or any political party, and no one has asserted otherwise. ¶64 As to the second of these criteria, we note, as an initial matter, that the language of section 48.1 (4)(b) mirrors the language in the analogous provision in the Congressional redistricting provisions of the Colorado Constitution. See Colo. Const. art. V, § 44.3 (4)(b). We therefore will construe the language in section 48.1 (4)(b) consistent with the language in section 44.3 (4)(b). Accordingly, for the reasons set forth in our opinion in In re Colorado Independent Congressional Redistricting Commission , ¶¶ 63–68, we now conclude that article V, section 48.1(4)(b) is coextensive with the applicable VRA provisions as they existed in 2018 and establishes no further requirements for the Commission. See also Legis. Council, Colo. Gen. Assembly, Rsch. Pub. No. 702-2, 2018 State Ballot Information Booklet , at 24 (explaining the provisions of Amendment Z and mirroring the explanations of the analogous Congressional redistricting provisions). As a result, we presume that in adopting the phrase "including diluting the impact of that racial or language minority group's electoral influence" in article V, section 48.1(4)(b), Colorado voters were referring to the then-existing protections against voter influence that were encompassed in the VRA. See In re Colo. Indep. Cong. Redistricting Comm'n , ¶¶ 63–68.
¶65 Applying the foregoing principles here, we note that, for the reasons set forth above, the Commission has complied with section 2 of the VRA. Moreover, with the exception of Senator Norton, no party has argued that the Plans before us have resulted in vote dilution, as we have previously defined that term, and we thus proceed to address Senator Norton's assertion.
¶66 Senator Norton contends that in splitting the City of Greeley as it did, the Commission violated section 48.1(4)(b) because it diluted the electoral influence of non-Hispanic voters in Senate District 13. Senator Norton, however, has offered no substantive legal analysis in support of such an assertion. Nor has he pointed to any evidence in the record to support his contention, and we have seen none.
¶67 Accordingly, we conclude that the Commission did not violate section 48.1(4) in approving the Plans now before us, and therefore, we may properly give effect to those Plans.
III. Conclusion
¶68 For these reasons, we conclude that the Commission did not abuse its discretion in applying the criteria set forth in article V, section 48.1 of the Colorado Constitution. Accordingly, we approve the Plans submitted to us and direct the Commission to file those Plans with the Secretary of State no later than December 29, 2021, as required by article V, section 48.3(5) of our constitution.
APPENDIX
Colorado Senate Districts Statewide — Final Approved Plan
Colorado Senate Districts Denver Metro Area — Final Approved Plan
Colorado Senate Districts South Denver Metro Area — Final Approved Plan
Colorado Senate Districts North Denver Metro Area — Final Approved Plan
Colorado Senate Districts North 1-25 Area — Final Approved Plan
Colorado Senate Districts Douglas County — Final Approved Plan
Colorado Senate Districts El Paso County — Final Approved Plan
Colorado Senate Districts Pueblo Area — Final Approved Plan
Colorado Senate Districts — East Final Approved Plan
Colorado Senate Districts — West Final Approved Plan
Colorado Senate Districts Grand Junction Area — Final Approved Plan
Colorado House Districts Statewide — Final Approved Plan
Colorado House Districts Denver Metro Area — Final Approved Plan
Colorado House Districts South Denver Metro Area — Final Approved Plan
Colorado House Districts North Denver Metro Area — Final Approved Plan
Colorado House Districts North 1-25 Area — Final Approved Plan
Colorado House Districts Douglas County — Final Approved Plan
Colorado House Districts El Paso County — Final Approved Plan
Colorado House Districts Pueblo Area — Final Approved Plan
Colorado House Districts — East Final Approved Plan
Colorado House Districts — West Final Approved Plan
Colorado House Districts Grand Junction Area — Final Approved Plan